Filed 4/21/25  Hazelle H. v. Superior Court CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HAZELLE H., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, <br><br> Respondent; <br><br> SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br> Real Party in Interest. | A172406 <br><br><br> (City & County of San Francisco Super. Ct. No. JD23-3264) |

Hazelle H., mother of 11-year-old Laylani J., petitions for extraordinary writ relief after the juvenile court, at the 12-month review hearing, terminated reunification services and set this dependency matter for a permanent placement hearing pursuant to Welfare and Institutions Code section 366.26.[1]  Mother contends the juvenile court erred in finding that reasonable visitation was provided because Laylani refused to visit mother during the last reporting period.  She requests that we reverse the order and

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

remand with instructions that mother be provided with an additional six months of reunification services and visitation. She also requests an immediate stay of the section 366.26 hearing scheduled for May 14, 2025. We conclude substantial evidence supports the juvenile court's findings. We deny the writ petition and request for a stay.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I. *Petition*

On August 31, 2023, the San Francisco Human Services Agency (Agency) filed a section 300 petition alleging that then nine-year-old Laylani came within the jurisdiction of the juvenile court due to domestic violence between mother and Brian W., mother's partner of nine years.[2] (§ 300, subds. (b)(1), (c), (j).) The petition alleged that two days earlier mother and Brian W. had a physical altercation. The argument began in their apartment and continued into the street. Mother pulled out one of Brian W.'s dreadlocks, and he, in turn, bit mother and pulled off her hair weave. Brian W. attempted to drive away and crashed the car into a light pole. Brian W. sustained an injury to his lip and was transported to a hospital. He was later jailed. Mother was also transported to jail. The petition further alleged that Brian W. has punched, scratched and burned mother in the presence of the minor. Laylani was detained and placed with a relative.

---

[2] The petition also notes that the Agency detained Laylani's younger half siblings. The Agency's detention report states that Brian W. is the alleged father of Laylani's half siblings, who are twins. Laylani's father is deceased. Mother filed a separate writ petition challenging the termination of services and setting of a section 366.26 hearing regarding the half siblings. We address mother's arguments regarding the twins in our concurrently filed opinion (*Hazelle H. v. Superior Court* (Apr. 21, 2025, A172410) [nonpub. opn.]). Our factual and procedural summary focuses on the reunification services and visitation provided regarding Laylani.

## II.     *Detention and Disposition/Jurisdiction Hearings*

The Agency's September 1, 2023, detention report summarized the domestic violence incident on August 29th.  It reported that Laylani witnessed the incident and that over the past nine years she witnessed multiple prior incidents in which Brian W. punched, scratched and burned mother.  Laylani was very fearful of Brian W., whom she said hurt mother whenever he got mad, which was frequently.  Mother's twin sister, Sabrina H., also reported that Brian W. was physically violent with mother and yelled at Laylani and that mother minimized Brian W.'s behavior.  Mother told the social worker that Brian W. had bitten her, pulled her hair, and choked her.  She confirmed they had been in a relationship for nine years.  According to mother, she and Brian W. argued and fought more frequently in the past year, since she learned that Brian W. had a child with another woman.  However, she said they had only one prior domestic violence incident, which she described as " 'just us arguing.' "  Mother was willing to file a restraining order against Brian W.

On September 5, 2023, the juvenile court ordered Laylani detained and placed with her maternal aunt.  It further ordered supervised visitation by mother, and the Agency was given discretion to move to monitored visits or visits supervised by a relative.  On September 13, 2023, the juvenile court issued a restraining order protecting mother from Brian W., with an expiration date of November 16, 2024.

The Agency's October 17, 2023, disposition report stated that Laylani was placed with her aunt Joellyn B. in Contra Costa County.  Laylani reported that on October 13, 2023, Brian W. called Laylani's phone, trying to reach mother.  Laylani wanted no contact with Brian W., and his calls to her cell phone made her angry.  Mother reported having no current contact with

Brian W.  However, Laylani and her aunts reported that mother and Brian W. were communicating by text and attempting to see each other. Laylani was worried that mother would reconnect with Brian W. despite what mother reported to the Agency.

Regarding visitation, the Agency reported mother had supervised visits with Laylani and the twins on Saturday and Sunday afternoons at the home of the maternal aunt, Sabrina H.  However, mother was not consistent with her visits.  Mother's interactions with Sabrina H. were turbulent.  Sabrina H. reported that during one visit mother cursed at her in front of the children, which led Sabrina H. to refuse to supervise further visits.  The Agency then submitted a request that visitation be at the East Bay Visitation Center.

In advance of the disposition/jurisdiction hearing, the Agency filed an addendum report which included a summary of mother's visitation during the second half of October 2023.  Mother missed six visits, and during one visit mother spent a large part of the time on video calls with her friends, preparing to go to a club that evening.  Mother also missed two appointments with her domestic violence case worker.  The Agency was concerned that mother was exhibiting "a malaise or lack of motivation . . . to reunify with her children."

At the November 16, 2023, disposition/jurisdiction hearing, mother submitted to the allegations that Laylani was at substantial risk of serious physical and emotional harm due to mother's failure to supervise or protect her from domestic violence, under section 300, subdivisions (b)(1) and (j)(1). The juvenile court committed Laylani to the care and custody of the Agency with relative placement and ordered reunification services for mother. Mother was admonished to follow the current visitation order.  Mother's court-ordered case plan included domestic violence survivor services,

4

parenting education, individual therapy, family therapy, drug testing, and substance use assessment.[3]

On February 2, 2024, the juvenile court granted mother's request to give the Agency discretion to allow unsupervised visits and overnight visits.

### III. *Six-month Review*

On April 19, 2024, in advance of the six-month review hearing, the Agency filed a status review report recommending an additional six months of reunification services. The Agency reported that although mother had engaged in reunification services, she continued contact with Brian W. in violation of the restraining order. Mother told the social worker that she did not see the harm in communicating with Brian W. by phone and text messaging. Mother said that she asked for the restraining order only because she understood that was what the Agency wanted. Mother completed a parenting class, and she began individual therapy. However, she discontinued therapy after four sessions because she did not find it helpful. She continued to participate in domestic violence survivor services, which she did find helpful.

Mother continued visitation and contacted the Agency in advance when her work prevented her from attending a visit. Mother progressed to overnight visitation. However, during the first overnight visit on February 16, 2024, Laylani reported that Brian W. came to mother's home shortly after the children arrived and remained with them until just before the children were picked up the next day. After receiving this report, the Agency returned to monitored weekly visitation, beginning on March 6, 2024.

---

[3] The Agency attempted to arrange visits between Brian W. and his children, Laylani's younger twin half siblings. However, Brian W. discontinued contact with the Agency, and his visitation referral was closed in February 2024.

Laylani reportedly returned from some visits in a negative mood. Laylani reported that mother told Laylani to stop telling the social worker what takes place at visits. Laylani did not want to visit mother's home. The overnight visit incident impacted Laylani's ability to trust her mother to keep Brian W. out of her home and reinforced Laylani's belief that mother was misleading the Agency. Mother and Brian W. denied having any contact during the overnight visit. The social worker attempted to focus mother and Laylani on spending time together during the current monitored visits without thinking about future visitation. Laylani communicated to her relatives that she wanted to remain with her maternal aunt rather than return home. The Agency was hopeful that with more positive visits and therapy the family would reunify within six months.

On June 24, 2024, the Agency filed an addendum report. Regarding visitation, the Agency reported that although Laylani did not want to visit mother at mother's home, she did want to continue visiting and spending time with mother. In mid-June, the Agency exercised its discretion to move visits from monitored to unsupervised. Mother visited with Laylani on Thursday afternoons in Antioch and then returned her to Laylani's aunt's home. Mother and Laylani had a positive visit on June 13th.

Laylani's aunt reported that Laylani was exhibiting some regressive behavior, and the Agency sought Wraparound therapy for her. The social worker reminded mother many times that the February overnight visit broke Laylani's trust in mother. The social worker continued to hope that positive visits would improve their relationship and that Laylani would want to visit at mother's home. The Agency proposed that mother begin overnight visits with the younger half siblings and developed a safety plan involving mother, mother's sisters, Laylani, and other family members in which they all agreed

6

to inform the Agency if mother had any contact with Brian W. Mother agreed to observe the terms of the restraining order.

The Agency filed a second addendum report on August 7, 2024. Mother and Laylani had another one-on-one visit on July 11th. Although Laylani continued to have a lack of trust in mother, she agreed to attend an overnight visit at mother's home with the twins on July 19, 2024. Following the overnight visit, Laylani told her aunt that Brian W. was at mother's home for part of the visit. The Agency paused visits while it investigated the report. When the social worker contacted mother to ask about Brian W.'s being at her home, mother yelled and "said 'she (Laylani) always does this'." Mother told the social worker she was not ready to talk and hung up. Laylani told the social worker that Brian W. was at the overnight visit for a short amount of time and then left and did not return. She did not report any unsafe interaction with Brian W., but seeing him made her feel scared, anxious, and nervous. Based on this incident and the prior overnight visit when Brian W. was also present, Laylani did not trust her mother. Laylani reported that mother told her, " '[I]f she was going to tell her aunt . . . , don't bother coming back over.' " The Agency recommended supervised visitation going forward based on mother's inability to set boundaries with Brian W.

At the six-month review hearing on August 8, 2024, the juvenile court continued reunification services for six months. It ordered supervised visitation with Agency discretion to move to unsupervised or to allow supervision by a relative.

IV. *Twelve-month Review*

At the 12-month review hearing, the Agency recommended that the juvenile court terminate reunification services and set a section 366.26 hearing. The juvenile court admitted into evidence the Agency's October 9,

2024 status report and its January 16, 2025 addendum report. The reports summarized the case background and the two overnight visits at mother's home during which Brian W. was also present. Since the second overnight visit in July 2024, Laylani stated that she neither trusted her mother nor wanted to visit her mother in person. Laylani was only interested in phone calls with mother. However, mother had not called Laylani in the months since the July 2024 overnight visit. They saw each other at a family gathering at the end of September 2024.

The Agency was concerned that mother was still in contact with Brian W. Mother stopped participating in individual therapy and domestic violence survivor counseling. Mother was assigned a new domestic violence counselor, with whom she did not develop a rapport. The social worker encouraged mother to reengage with therapy and domestic violence counseling, with limited success. Mother reported that she talked with her domestic violence counselor about how to improve her situation. However, mother did not discuss any specific strategies with the Agency social worker, and mother said she was not getting much out of the program and the counselor did not give her good feedback. The social worker suggested an alternative program, but mother was not interested in another referral, stating that the Agency was giving her an excessive amount of things to do. The Agency attempted to contact mother multiple times in October 2024 to discuss mother's reengaging in individual counseling. However, by the time mother responded and returned the necessary paperwork at the end of December, the counseling service had closed mother's case. The Agency explained that mother would need to undergo intake again. Mother declined to do so because "individual counseling would be one more thing to add to her list." The Agency attempted to provide family therapy for mother and

8

Laylani; however, Laylani refused to participate. The social worker encouraged Laylani to participate several times. However, Laylani did not change her mind.

The Agency reported on mother's communications with the social worker about the July 2024 overnight visit. Mother explained that she returned home from the park with the children and unintentionally left the door unlocked. Brian W. arrived unannounced and entered the home without permission, but he did not stay long. Mother said she texted Brian W. prior to the visit, telling him to stay away from the house because the children were visiting and it was a violation of the restraining order. Mother acknowledged continued phone communications with Brian W. but said she was trying to decrease communication. The Agency was concerned that mother was still in close contact with Brian W. and that she could potentially put the children at risk by allowing him to be present in her life. Mother's family members continued to report that mother communicated with Brian W. When the social worker spoke with mother about Laylani's fear of Brian W. and her distrust of mother based on the July overnight visit, mother responded that it was " 'one little mistake.' " This caused the social worker to be concerned that mother minimized Laylani's trauma and would not be able to protect Laylani from further emotional harm.

The juvenile court held the 12-month review hearing on January 29, 2025, which was 17 months after the children were removed from mother. The Agency social worker testified that Laylani was traumatized by the two overnight visits during which Brian W. was present. The social worker spoke with Laylani regularly and encouraged her to engage in family therapy and visits with mother. However, Laylani said she was not ready for in-person interactions with mother. According to the social worker, Laylani's therapist

reported that Laylani did not trust mother and was afraid of being in her home. When the social worker spoke with mother about Laylani, mother said she was irritated with Laylani's behavior and would reach out to Laylani when she was ready. The social worker had not attempted to schedule a supervised phone call between Laylani and mother; however, she encouraged mother to call Laylani and mother did not do so. Over the course of the dependency case, mother visited with Laylani about 48 times. The social worker testified that mother had not shown an understanding of the impact of domestic violence on Laylani. Mother also refused to reengage in individual therapy, which was one of her case plan requirements.

Mother testified that she ended her relationship with Brian W. when the dependency case was initiated and that she was no longer in contact with him. However, she invited him over for the February 2024 overnight visit, which she acknowledged was a "very bad mistake." Regarding the July 2024 overnight visit, mother testified she did not invite Brian W. to her home but he let himself in through an unlocked door. He was there briefly, and he left when mother told him to leave. Mother continued to have contact with Brian W. until August 2024, when they argued and she realized it was time to end the relationship.

Mother did not reengage in therapy because she did not feel it was helpful. She had not visited with Laylani since the July 2024 overnight visit. She then understood that Laylani did not trust mother to protect her.

The juvenile court found there was a substantial risk of detriment if the children were returned to mother's care. It further found that the Agency provided reasonable services to mother and that the brief period of time during which Laylani refused visits did not render the services inadequate. The juvenile court found "the social worker did a lot to encourage [mother], to

encourage visitation, to support Laylani, to try to get her to visits, but . . .
Laylani was traumatized and absent and declined to visit." It further found
that additional reunification services were not warranted.

The juvenile court terminated reunification services and set a section
366.26 hearing for May 14, 2025.

## DISCUSSION

Mother argues the trial court erred in finding that the Agency provided
reasonable visitation given that Laylani refused to visit with mother after the
July 2024 overnight visit. Before the juvenile court may set a section 366.26
permanency planning hearing, it must find by "clear and convincing evidence
that reasonable services were provided or offered to the parent . . . ."
(§ 366.21, subd. (g)(1)(C)(ii).) On review of the juvenile court's finding that
reasonable services were provided to mother, we determine " 'whether there
is substantial evidence from which a reasonable trier of fact could make the
necessary findings based on the clear and convincing evidence standard.' "
(*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1239, italics omitted,
disapproved on other grounds in *Michael G. v. Superior Court* (2023) 14
Cal.5th 609, 631, fn. 8.)

Substantial evidence supports the juvenile court's finding that mother
received reasonable visitation. Laylani had about 48 visits with mother after
she was removed from mother's care following a domestic violence incident on
August 29, 2023, that resulted in the arrest of mother and Brian W. and a
restraining order against Brian W. The Agency was given discretion to move
visits to unsupervised and overnights, and it did so in February 2024. At the
very first overnight visit on February 16, 2024, Brian W. was present in the
home for nearly the entire visit, in violation of the restraining order. His
presence traumatized Laylani and caused her not to trust mother. Mother

11

told Laylani to stop telling the social worker what takes place at visits. Laylani no longer wanted to visit mother in mother's home. Mother visits were moved back to supervised, and Laylani continued to visit with mother. In mid-June, after the Agency again authorized unsupervised visits, Laylani began one-on-one visits with mother in Antioch. In mid-July, Laylani attended a second overnight visit at mother's home with her younger half siblings. Brian W. was present again, although this time only for a short period. Mother's initial response when the social worker contacted mother to investigate the report of Brian W.'s presence was to blame Laylani for reporting and to refuse to further speak with the social worker. Laylani reported that mother told her " 'don't bother coming back over' " if she told her aunt about Brian W.

Following the second overnight visit, Laylani was understandably opposed to further in-person visits with mother. However, she was interested in receiving phone calls from mother. The social worker encouraged Laylani to participate in family therapy and to visit with her mother, but Laylani said she was not ready to do so. The social worker also encouraged mother to call Laylani, but mother did not do so. The social worker testified that when she spoke with mother about Laylani, mother said she was irritated with Laylani's behavior and would reach out to Laylani when she was ready.

We disagree with mother's argument that she was not given reasonable visitation because the Agency allowed Laylani to decide whether visitation occurs. (*In re S.H.* (2003) 111 Cal.App.4th 310, 316, 320 [reversing visitation order that stated " 'if the children refuse a visit, then they shall not be forced to have a visit' " because the order effectively made the minors' wishes the "*sole* factor in determining whether any visitation takes place"].) Case authority recognizes that although the juvenile court may not delegate to the

12

child the decision of whether visitation will occur, the child's desires may be a dominant factor in administering visitation. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138 ["visitation may not be dictated solely by the child involved although the child's desires may be a dominant factor"]; *In re Julie M.* (1999) 69 Cal.App.4th 41, 51 [recognizing that "a child's aversion to visiting an abusive parent may be a 'dominant' factor in administering visitation, but it could not be the *sole* factor"].)

The record contains evidence of several factors that impacted mother's visitation. Laylani regularly visited with mother for nearly a year after the dependency proceeding was initiated. During this time, mother continued contact with Brian W. in violation of the restraining order and twice permitted him to be in Laylani's presence during overnight visits. It was not until after the second overnight visit in July 2024, when Laylani reported Brian W.'s presence again and mother blamed Laylani for doing so, that Laylani refused further in-person visits. Even still, Laylani was willing to have phone calls with mother, and mother was encouraged to contact Laylani by phone but did not do so.

On this record, we disagree that Laylani's wishes were the *sole* factor in determining whether visits occurred after July 2024. Mother's actions, including her ongoing contact with Brian W., her blaming Laylani for reporting Brian W.'s presence at visits, and her failure to contact Laylani by phone, also contributed to the lack of visits between Laylani and mother. The evidence further indicates that the Agency, which was given responsibility to manage the details of the visits, considered the impact of the overnight visits on Laylani and the trauma she experienced. This was not improper. (*In re S.H., supra*, 111 Cal.App.4th at p. 317 [finding that child may not be given "power to veto all visits" but noting that "the child's input and refusal and the

13

possible adverse consequences if a visit is forced against the child's will are factors to be considered in administrating visitation"]; § 362.1, subd. (a)(1)(A).)  We conclude there was substantial evidence to permit a reasonable trier of fact to find, under the clear and convincing evidence standard, that the Agency offered or provided reasonable visitation.

## DISPOSITION

The petition for extraordinary writ is denied on the merits.  (§ 366.26, subd. (*l*)(1)(c); Cal. Rules of Court, rule 8.452.)  The request for a stay is denied.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)


Jackson, P. J.

WE CONCUR:

Simons, J.
Burns, J.

A172406/*Hazelle H. v. Superior Court (S.F. Human Services Agency)*

14